MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:    2013 ME 100
Docket:      Cum-13-155
Argued:      September 9, 2013
Decided:     November 14, 2013

Panel:       SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

# MAINETODAY MEDIA, INC.

## v.

# STATE OF MAINE

GORMAN, J.

[¶1]  MaineToday Media, Inc., d/b/a Portland Press Herald/Maine Sunday Telegram, appeals from a decision of the Superior Court (Cumberland County, *Cole, J.*) upholding the State of Maine's denial of MaineToday's request to inspect and copy Enhanced 9-1-1 (E-9-1-1) call transcripts.  MaineToday argues that the Freedom of Access Act (FOAA), 1 M.R.S. §§ 400-414 (2012), mandates disclosure of the transcripts as public records and that no exception to their disclosure applies.[1]  We vacate the judgment.

---

[1]  The Reporters Committee for Freedom of the Press, the New England First Amendment Center, the Maine Association of Broadcasters, the Maine Freedom of Information Coalition, the Maine Press Association, and the Associated Press have filed a joint amicus curiae brief in support of MaineToday's position.

## I.  BACKGROUND

[¶2]  The parties stipulated to the following facts.  During 2012, Derrick Thompson, his mother Susan Johnson, and his girlfriend Alivia Welch were renting an apartment in Biddeford from landlord James Earl Pak.  On December 29, 2012, at 6:07 p.m., Thompson placed a call to E-9-1-1 regarding an altercation with Pak.  Biddeford police responded to the call and left after speaking with Thompson and Pak.  Three minutes after police left the scene, and forty-seven minutes after Thompson's initial E-9-1-1 call, Johnson placed a second call to E-9-1-1 to report that Pak had shot her, Thompson, and Welch.[2]  Eight minutes after that, Pak's wife, Armit Pak, placed a third call to E-9-1-1.  All three calls were recorded and transcripts for each have been prepared.

[¶3] On January 2, 2013, MaineToday sent the first of a series of requests to inspect and copy the three Pak transcripts to the Biddeford Police Department, the Maine State Police within the Department of Public Safety (MSP), the Attorney General's Office, and the Bureau of Consolidated Emergency Communications.[3]

---

[2]  Pak was charged by criminal complaint on December 31, 2012, and held without bail.  *State v. Pak*, ALFSC-CR-2012-2747 (Me. Super. Ct., York Cty.).  On February 5, 2013, he was indicted on two counts of intentional or knowing murder, 17-A M.R.S. § 201(1)(A) (2012); one count of aggravated attempted murder (Class A), 17-A M.R.S. § 152-A(1) (2012); one count of elevated aggravated assault (Class A), 17-A M.R.S. § 208-B(1)(A) (2012); and one count of burglary (Class A), 17-A M.R.S. § 401(1)(B)(1) (2012).  Pak pleaded not guilty to all charges, is undergoing psychiatric evaluations, and remains in jail awaiting his trial.

[3]  Although MaineToday eventually requested "all E-9-1-1 transcripts in connection with all active homicide investigations and all ongoing homicide prosecutions, including but not limited to the three calls

The State[4] denied the requests on the ground that the transcripts constituted "intelligence and investigative information" in a pending criminal matter, and therefore were confidential pursuant to the Criminal History Record Information Act (the CHRIA), 16 M.R.S. §§ 611-623 (2012).

[¶4]  MaineToday petitioned the Superior Court for review of the State's denial pursuant to 1 M.R.S. § 409(1).  In March of 2013, after conducting a hearing and an *in camera* review of the unredacted transcripts and the audio recordings of each E-9-1-1 call in the Pak matter, the court affirmed in its entirety the State's denial of MaineToday's request.  MaineToday appeals.

## II. DISCUSSION

[¶5]  This case "highlights the conflict that exists between the public interest in open access to governmental records, on the one hand, and the public interest in protecting the integrity of criminal investigations . . . on the other." *Lewiston Daily Sun v. City of Lewiston*, 596 A.2d 619, 622 (Me. 1991).  We consider, for the first time, the public disclosure of information transmitted through E-9-1-1 calls by evaluating the interplay of three distinct Maine statutes—FOAA; the CHRIA; and the emergency services communication statute (the ESC), 25 M.R.S. §§ 2921-2935 (2012).

---

on the day of the James Pak shooting," the parties' argument focuses only on the Pak transcripts, and those are the only transcripts we consider in this appeal.

[4]  The State, as represented by the Attorney General's office, apparently accepted the ultimate responsibility for responding to MaineToday's requests.

4

[¶6]  In interpreting these provisions, we first look to the plain language of the provisions to determine their meaning.  *Anastos v. Town of Brunswick*, 2011 ME 41, ¶ 9, 15 A.3d 1279.  If the language is unambiguous, we interpret the provisions according to their unambiguous meaning "unless the result is illogical or absurd."  *Cyr v. Madawaska Sch. Dep't*, 2007 ME 28, ¶ 9, 916 A.2d 967.  If the plain language of a statute is ambiguous—that is, susceptible of different meanings—we will then go on to consider the statute's meaning in light of its legislative history and other indicia of legislative intent.  *Anastos*, 2011 ME 41, ¶ 9, 15 A.3d 1279; *Competitive Energy Servs. LLC v. Pub. Utils. Comm'n*, 2003 ME 12, ¶ 15, 818 A.2d 1039.

[¶7]  Pursuant to 1 M.R.S. § 409(1), the Superior Court conducted "a trial de novo" to determine whether the denial of MaineToday's FOAA request "was not for just and proper cause."  Although the parties filed an agreed-to statement of facts, we review any additional findings made by the Superior Court for clear error, and consider its legal conclusions, including the interpretation of the relevant statutory provisions, de novo. *Blethen Me. Newspapers, Inc. v. State*, 2005 ME 56, ¶ 10, 871 A.2d 523.

A.  Applicable Statutes

    1.  Freedom of Access Act

[¶8]  Like its federal counterpart, the Freedom of Information Act (FOIA), 5 U.S.C.A. § 552 (West, Westlaw through P.L. 113-31 approved 8-9-13),[5] FOAA's "basic purpose . . . is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."[6] *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quotation marks omitted).  The Legislature has declared that "public proceedings exist to aid in the conduct of the people's business," and enacted FOAA with the express intent that public actions "be taken openly and that the records of [public] actions be open to public inspection and [public] deliberations be conducted openly."  1 M.R.S. § 401; *see Citizens Commc'ns Co. v. Att'y Gen.*, 2007 ME 114, ¶ 9, 931 A.2d 503.  To that end, FOAA requires generally that, "[e]xcept as otherwise provided by statute, a person has the right to inspect and copy any public record in accordance with this section within a

---

   [5]  "Cases decided pursuant to FOIA inform our analysis of Maine's FOAA."  *Blethen Me. Newspapers, Inc. v. State*, 2005 ME 56, ¶ 13, 871 A.2d 523.

   [6]  "The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know *what their government is up to*."  *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772-73 (1989) (quotation marks omitted).

6

reasonable time of making the request to inspect or copy the public record."[7]
1 M.R.S. § 408-A; *see S. Portland Police Patrol Ass'n v. City of S. Portland*,
2006 ME 55, ¶ 6, 896 A.2d 960. To best promote its "underlying purposes and
policies as contained in the declaration of legislative intent," FOAA explicitly
states that it must be "liberally construed and applied." 1 M.R.S. § 401.

[¶9] Excepted from the definition of public records, however, and therefore
exempt from the general rule of disclosure, are records that fall within any one of
nineteen categories set out in 1 M.R.S. § 402(3)(A)-(R). *See S. Portland Police
Patrol Ass'n*, 2006 ME 55, ¶ 6, 896 A.2d 960. "The burden of proof is on the
agency or political subdivision [from whom the information is sought] to establish
just and proper cause for the denial of a FOAA request."[8] *Anastos*, 2011 ME 41,
¶ 5, 15 A.3d 1279 (quotation marks omitted); *see* 1 M.R.S. § 408-A(4). Further,
the necessary corollary of the directive to liberally construe FOAA is the "strict

---

[7] A "public record" is

> any written, printed or graphic matter or any mechanical or electronic data compilation
> from which information can be obtained, directly or after translation into a form
> susceptible of visual or aural comprehension, that is in the possession or custody of an
> agency or public official of this State or any of its political subdivisions, or is in the
> possession or custody of an association, the membership of which is composed
> exclusively of one or more of any of these entities, and has been received or prepared for
> use in connection with the transaction of public or governmental business or contains
> information relating to the transaction of public or governmental business.

1 M.R.S. § 402(3) (2012).

[8] To the extent we have suggested that the party who submitted a FOAA request bears the burden of
establishing a FOAA violation, we clarify now that it is the agency's burden—in denying the request,
before the Superior Court, and before us—to show that some exception to FOAA applies. *See, e.g.,
Yusem v. Town of Raymond,* 2001 ME 61, ¶ 16, 769 A.2d 865; *Chase v. Town of Machiasport*, 1998 ME
260, ¶ 9, 721 A.2d 636.

construction of any exceptions to the required public disclosure," *Citizens Commc'ns*, 2007 ME 114, ¶ 9, 931 A.2d 503.

[¶10]  The parties do not dispute that the audio recordings of E-9-1-1 calls and documents transcribing those audio recordings are in the possession of one or more government agencies—here, the Bureau of Emergency Services Communication, the Attorney General's Office, the Biddeford Police Department, the Maine State Police, and the Department of Public Safety, at least—and are used in connection with public or governmental business, that is, the provision of public emergency services.  *See* 1 M.R.S. § 402(3); *Dow v. Caribou Chamber of Commerce & Indus.*, 2005 ME 113, ¶¶ 10-18, 884 A.2d 667 (discussing whether an entity is a government agency with reference to its function, source of funding, whether the government maintains involvement in or control over the entity, and whether it was created by private or legislative action).

[¶11]  The audio recordings of E-9-1-1 calls and the transcripts of those calls therefore are subject to disclosure as public records unless they fall within one of the exceptions found in 1 M.R.S. § 402(3)(A)-(R).  Of these, the only exception relevant to the present matter is one for "[r]ecords that have been designated confidential by statute."  1 M.R.S. § 402(3)(A).  Whether the transcripts of the Pak E-9-1-1 calls do not qualify as public records and are exempt from FOAA because

8

they are confidential pursuant to a statute first depends on an analysis of the ESC, and then on the application of the CHRIA.

2. Emergency services communication

[¶12]   Pursuant to the ESC, it is the duty of the Emergency Services Communication Bureau (the Bureau), within the Public Utilities Commission, to "implement and manage" the E-9-1-1 system.[9] 25 M.R.S. § 2926(1).  Pursuant to 25 M.R.S. § 2926(3), the Bureau has promulgated various rules regarding the E-9-1-1 system.  9 C.M.R. 65 625 001 (2007).  These rules provide, inter alia, that both sides of the conversation for every incoming E-9-1-1 call must be recorded, with the year, date, and time of each call contemporaneously documented. 9 C.M.R. 65 625 001-4 § 3(4)(B).  Those recordings must be retained for at least thirty days, and ideally, for at least sixty days.   9 C.M.R. 65 625 001-4 § 3(6)(B)(3).  The statute further provides that "[t]he system databases, wherever located or stored, are the property of the bureau and their confidentiality is governed by section 2929." 25 M.R.S. § 2926(6).

[¶13]  Section 2929, in turn, draws a distinction between the transcripts of E-9-1-1 calls and the audio recordings of the calls; it states that although the

---

[9]   Although MaineToday filed its FOAA request with the Bureau of Consolidated Emergency Communications, that agency is part of the Department of Public Safety and provides call-taking and dispatching services for municipalities and entities that do not have their own public safety answering point.  25 M.R.S. §§ 1533, 2923-A (2012).  It is the Emergency Services Communication Bureau, within the Public Utilities Commission, that administers the E-9-1-1 system and maintains E-9-1-1 records. 25 M.R.S. § 2926(1), (6) (2012).

E-9-1-1 audio recordings are "confidential and may not be disclosed," the "information contained in the audio recordings is public information and must be disclosed in transcript form." 25 M.R.S. § 2929(4).

[¶14] When an E-9-1-1 transcript is requested pursuant to section 2929(4), however, "confidential information" from that call, as defined in 25 M.R.S. § 2929(1), may not be disclosed.[10] For purposes of section 2929, only the names, addresses, telephone numbers, and certain medical information of particular people qualifies as "confidential information." In addition, the statute expressly provides that when a transcript contains such "confidential information," any other information from those calls that is not "confidential information" remains subject to the disclosure requirements of FOAA. 25 M.R.S. § 2929(3).

[¶15] In short, title 25 may be read consistently with FOAA to require that, upon request, E-9-1-1 transcripts—but not the audio recordings themselves—must be disclosed after any "confidential information" as defined in section 2929(1) is removed.[11] The next issue, then, is whether, even if redacted pursuant to section

---

[10] The statute contains exceptions that allow the disclosure of E-9-1-1 audio recordings, including "confidential information" from those recordings, to certain agencies for specific purposes. 25 M.R.S. § 2929(2)(A)-(D), (4)(A)-(D) (2012). None of these exceptions applies here.

[11] The issue of redaction itself is also the subject of some dispute. The statute requires the excising of confidential information from an otherwise public document. 25 M.R.S. § 2929(1)-(3) (2012); *see Springfield Terminal Ry. Co. v. Dep't of Transp.*, 2000 ME 126, ¶ 11 n.4, 754 A.2d 353. In some instances, however, the information "cannot be dissected into sensitive and nonsensitive information because [it is contained in] a single, integrated [document]. *Anastos v. Town of Brunswick*, 2011 ME 41, ¶ 12, 15 A.3d 1279. The Superior Court in this matter determined that redaction was not appropriate: "Due to the abstract nature of the danger, redacting the transcripts is not feasible . . . ." The State does not

2929, the Pak E-9-1-1 transcripts are otherwise "designated confidential by statute" such that they do not meet the definition of public records and the disclosure generally mandated by FOAA does not apply. 1 M.R.S. § 402(3)(A). The statute on which the State relies in arguing that the E-9-1-1 transcripts are "designated confidential by statute" is the CHRIA.

### 3. Criminal History Record Information Act

[¶16]  The CHRIA dictates whether, when, to whom, and how criminal history information may be disclosed. 16 M.R.S. §§ 611-623. As it applies to the present matter, the CHRIA limits the "dissemination of intelligence and investigative information" as follows:[12]

> **1. Limitation on dissemination of intelligence and investigative information.**  Reports or records that contain intelligence and investigative information and that are prepared by, prepared at the direction of or kept in the custody of a local, county or district criminal justice agency; the Bureau of State Police; [or] the Department of the Attorney General . . . are confidential and may not be disseminated if there is a reasonable possibility that public release or inspection of the reports or records would:
>
> **A.** Interfere with law enforcement proceedings;
>
> **B.** Result in public dissemination of prejudicial information concerning an accused person or concerning the prosecution's

---

argue that the transcripts here are too integrated with confidential information to redact, but rather that "surgical redaction" is too burdensome for it to accomplish. The statute contains no exception to disclosure based on the onerousness of the task, however.

[12]  The intentional dissemination of confidential intelligence and investigative information is a Class E crime. 16 M.R.S. § 614(4) (2012).

evidence that will interfere with the ability of a court to impanel an impartial jury;

**C.** Constitute an unwarranted invasion of personal privacy;

**D.** Disclose the identity of a confidential source;

**E.** Disclose confidential information furnished only by the confidential source;

**F.** Disclose trade secrets or other confidential commercial or financial information designated as such by the owner or source of the information or by the Department of the Attorney General;

**G.** Disclose investigative techniques and procedures or security plans and procedures not generally known by the general public;

**H.** Endanger the life or physical safety of any individual, including law enforcement personnel;

**I.** Disclose conduct or statements made or documents submitted by any person in the course of any mediation or arbitration conducted under the auspices of the Department of the Attorney General;

**J.** Disclose information designated confidential by some other statute; or

**K.** Identify the source of complaints made to the Department of the Attorney General involving violations of consumer or antitrust laws.

. . . .

16 M.R.S. § 614(1). The unambiguous language of section 614 demonstrates the

Legislature's intent to shield law enforcement from the obligation to disclose

12

materials that might compromise its public safety mission.  As we have said, the

"important policy objectives" of section 614 are those of

> (1) protecting the integrity of criminal prosecutions and the constitutional right of those charged with crimes to a fair and impartial jury; (2) maintaining individual privacy and avoiding the harm that can result from an unjustified disclosure of sensitive personal or commercial information; and (3) ensuring the safety of the public and law enforcement personnel.

*Blethen Me. Newspapers, Inc.*, 2005 ME 56, ¶ 12, 871 A.2d 523 (footnotes

omitted).

[¶17]   Despite these important objectives, confidentiality pursuant to the

CHRIA is afforded only if the record that the government seeks to shield

(1) contains intelligence or investigative information; (2) was prepared by or at the

direction of, or is kept in the custody of, a criminal justice agency; and (3) would,

if disclosed, create a reasonable possibility of one or more of the harms detailed in

section 614(1)(A)-(K).

B.  Analysis

1.  Intelligence or investigative information

[¶18]    For  purposes  of  section  614,  "intelligence  and  investigative

information" is defined as

> information collected by criminal justice agencies or at the direction of criminal justice agencies in an effort to anticipate, prevent or monitor possible criminal activity, including operation plans of the collecting agency or another agency, *or* information compiled in the course of investigation of known or suspected crimes, civil violations

> and prospective and pending civil actions. "Intelligence and investigative information" does not include information that is criminal history record information.

16 M.R.S. §§ 611(8) (emphasis added). Section 611(8) therefore presents two alternatives by which a record could meet this definition—if it is collected by or at the direction of a criminal justice agency with regard to criminal activities *or* if it is compiled in the course of investigating a crime. [13]

    a. Collected by or at the direction of a criminal justice agency

[¶19] Because the ESC makes clear that E-9-1-1 transcripts are the property of the Bureau no matter where they are located or stored, the entity at issue in determining whether E-9-1-1 transcripts are collected by or at the direction of a criminal justice agency is the Bureau itself. 25 M.R.S. § 2926(6).

[¶20] A "[c]riminal justice agency" is defined as "a federal, state, district, county or local government agency or any subunit thereof that performs the administration of criminal justice under a statute or executive order, and that allocates a substantial part of its annual budget to the administration of criminal justice" and includes "[c]ourts and the Department of the Attorney General." 16 M.R.S. § 611(4).

---

[13] To the extent MaineToday suggests that information compiled in the investigation of a crime only qualifies as intelligence or investigative information if it was compiled by a criminal justice agency, it has misread the plain terms and structure of the statute, which provides for two distinct alternatives. 16 M.R.S. § 611(8) (2012).

14

[¶21]  The Bureau is part of the Public Utilities Commission.  25 M.R.S. § 2926(1).  It "implement[s] and manage[s] E-9-1-1" by developing system elements, providing quality assurance, and providing call coverage and technical support, and is funded through statewide surcharges on telecommunications services.  25 M.R.S. §§ 2926, 2927.  Although the Bureau's product is certainly used for criminal justice purposes on a daily basis, the Bureau manages the telecommunications necessary for the provision of emergency services, and does not meet the definition of a criminal justice agency.

b.  Compiled in investigating a crime

[¶22]  Alternatively, the E-9-1-1 transcripts qualify as intelligence or investigative information if they were "compiled" for purposes of investigating known or suspected crimes.  16 M.R.S. § 611(8).

[¶23]  The United States Supreme Court has had occasion to consider the meaning of "compile" pursuant to FOIA.  In *John Doe Agency*, the Supreme Court noted that a compilation, "in its ordinary meaning, is something composed of materials collected and assembled from various sources or other documents" and "seems readily to cover documents already collected by the Government originally for non-law-enforcement purposes."  493 U.S. at 153.  The Supreme Court also took pains to note that "compiled" is not synonymous with "originally compiled," and thus includes information gathered from multiple sources, and created at

previous times and for different purposes. *Id*. at 154. In short, the Supreme Court held, "information originally compiled for a non-law-enforcement purpose" can nevertheless be exempt from disclosure "when it is recompiled at a future date for law enforcement purposes." *Id*. at 157.

[¶24] According to the plain language of this portion of section 614, as informed by the analyses in *John Doe Agency*, the State has established that the transcripts are intelligence and investigative information pursuant to this alternative.[14] Although the audio recordings and transcripts were created by the Bureau for administrative purposes, we agree that the Maine State Police, the Attorney General's Office, and/or the Biddeford Police Department have "compiled" them for the purpose of investigating the crimes with which Pak was charged.

2.  Preparation or custody

[¶25] Next, section 614 applies only to that information prepared for or maintained by particular government agencies or types of agencies. Here, the E-9-1-1 transcripts, even if not prepared by or at the direction of law enforcement,

---

[14] There is no dispute that the information requested by MaineToday does not constitute "criminal history record information," defined as "notations or other written evidence of an arrest, detention, complaint, indictment, information or other formal criminal charge relating to an identifiable person," including "the identification or description of the person charged and any disposition of the charge." 16 M.R.S. §§ 611(3), (8) (2012).

are kept in the custody of the Bureau of State Police or the Department of the Attorney General, two entities specifically named in section 614(1).[15]

3. Reasonable possibility

[¶26] Finally, it was the State's burden to establish that disclosing the transcripts would create a reasonable possibility of one or more of the harms detailed in section 614(1)(A)-(K).[16] Because the CHRIA does not define a "reasonable possibility" for purposes of determining the scope of a FOAA exception, we look to the plain and ordinary meaning of the terms. *See State v. Paradis*, 2010 ME 141, ¶ 6, 10 A.3d 695. "Reasonable" means "the product of a rational thought process." *State v. Estes*, 418 A.2d 1108, 1115 (Me. 1980) (quotation marks omitted). It may be defined as "[f]air, proper, or moderate under

---

[15] MaineToday suggests that even if the copies of the transcripts in the police and prosecutors' files are confidential pursuant to section 614, the copies in the Bureau files are not, given that the transcripts continue to be the property of Bureau no matter where they are stored or how they now are being used, *see* 25 M.R.S. §§ 2926(6), 2929(3) (2012). This argument is not persuasive. We have held that the "location of the document has no bearing on its status" unless the statute affording confidentiality states that such confidentiality depends on where the information is physically kept. *S. Portland Police Patrol Ass'n v. City of S. Portland*, 2006 ME 55, ¶ 8, 896 A.2d 960; *see Cyr v. Madawaska Sch. Dep't*, 2007 ME 28, ¶ 17, 916 A.2d 967 (Calkins, J., dissenting) ("The physical location of the information is not important."). Indeed, allowing the dissemination of the Bureau version of a transcript while maintaining the statutory confidentiality of the AG's identical copy of the same transcript would render the purpose of that statutory confidentiality a complete nullity. The danger is not, as MaineToday contends, that law enforcement can render confidential any document merely by placing it in a police file, but instead that one agency would disclose a document that another agency is entitled to keep confidential. *See Lewiston Daily Sun v. City of Lewiston*, 596 A.2d 619, 622 (Me. 1991) ("[T]he consequences of an erroneous public release are irreversible."). In fact, the Legislature clearly intended that the requirements of the CHRIA, in conjunction with those of the ESC, be rigorous enough to preclude the sheltering of a public document in an unrelated confidential file. *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 157 (1989) (stating that "[e]vasional commingling" is prevented by the language of the statute requiring consideration of the nature of each document).

[16] As a practical matter, this may need to be accomplished through the submission of sealed files or an *in camera* review. *See Springfield Terminal Ry. Co.*, 2000 ME 126, ¶ 14, 754 A.2d 353.

the circumstances," Black's Law Dictionary 1379 (9th ed. 2009), or as "not absurd," "not ridiculous," "not extreme," or "not excessive," Webster's Third New International Dictionary 1892 (2002).

[¶27] As we have stated in other contexts, a reasonable possibility is different, and less burdensome to prove, than a reasonable *probability*; it is synonymous with a "reasonable likelihood," and is a lower standard than a preponderance of the evidence. *See State v. Pabon*, 2011 ME 100, ¶ 35, 28 A.3d 1147 (considering the reasonable possibility standard for determining the likelihood that a different jury instruction would have led to a more favorable verdict); *Terry v. T. J. C. Coin & Stamp Co.*, 447 A.2d 812, 814 (Me. 1982) ("Reasonable possibility is a standard less onerous than proof that success is more likely than not." (quotation marks omitted)); *Bowman v. Dussault*, 425 A.2d 1325, 1328 (Me. 1981) (evaluating the propriety of an attachment order based on whether the underlying claim has a "reasonable possibility of recovery").

[¶28] The State asserted to MaineToday and before the Superior Court that disclosing the E-9-1-1 transcripts would create the reasonable possibility of interfering with law enforcement proceedings pursuant to 16 M.R.S. § 614(1)(A).[17]

---

[17] The State also asserted that disclosing the transcripts would interfere with its ability to impanel an impartial jury pursuant to 16 M.R.S. § 614(1)(B), and would invade the personal privacy of those involved pursuant to 16 M.R.S. § 614(1)(C). The Superior Court determined that the State did not meet its burden as to either of these two grounds, and the State did not appeal those portions of the court's decision. Thus, we do not consider the State's contentions that it established these two alternative bases for maintaining the confidentiality of the Pak transcripts because they are not preserved for appellate

We considered a similar issue in *Campbell v. Town of Machias*, in which a woman sought—and was denied—access to police records regarding a report lodged against her by her bank. 661 A.2d 1133, 1134 (Me. 1995). We discussed the ways in which the disclosure of records could interfere with law enforcement proceedings—by "prematurely reveal[ing] the scope, nature or direction of the government's case"; "allow[ing] the target of a criminal investigation to construct defenses or to fabricate alibis"; "creat[ing] the possibility of harassment or intimidation of witnesses"; or "result[ing] in the destruction of evidence." *Id*. at 1136. We concluded that the prosecutor's justification for denying the request on grounds that disclosure would "compromise the case by providing discovery prior to a formal charged being lodged" against her, and would "interfere with the collection of evidence and might result in the harassment of witnesses" was sufficient to meet the State's burden because it was "the kind of showing approved" by federal courts in FOIA matters. *Id*. at 1136.

[¶29] Here, in contrast, the State identified no such specific concerns, but instead offered an explanation for the denial that merely reiterated the language of the statute itself. The timing of the charges also affects the comparison of *Campbell* with the present matter. Whereas the State in *Campbell* had not yet

---

review. *See* M.R. App. P. 2(b)(4); *Langevin v. Allstate Ins. Co.*, 2013 ME 55, ¶ 6 n.4, 66 A.3d 585 (stating that when a party does not cross-appeal, its contentions of error by the trial court are not preserved for appellate review); *Lyle v. Mangar*, 2011 ME 129, ¶ 22, 36 A.3d 867 (same); *Millien v. Colby Coll.*, 2005 ME 66, ¶ 9 n.3, 874 A.2d 397 (same).

pursued any charges against the defendant, Pak had already been the subject of an initiating criminal complaint when MaineToday first requested the transcripts.[18] Although the State contends that, even while an indictment is pending, the investigation remains ongoing, it did not identify any particular investigation yet to be completed in the Pak matter or how those portions of the investigation could be affected by the availability of the Pak E-9-1-1 transcripts.[19] Rather, the State seeks a blanket rule that "in any active homicide investigation (including unsolved cases) and/or prosecutions, any E-911 recording and transcript constitutes intelligence and investigative information subject to 16 M.R.S. § 614," and that such recordings and transcripts fulfill the requirements of section 614 and therefore are confidential as a matter of course.

[¶30] The United States Supreme Court has rejected such "universal" approaches that ask the court to "presume that virtually every [record] is confidential" and render these rebuttable presumptions "in practice all but irrebuttable." *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 175, 177 (1993). The Supreme Court instead interpreted FOIA to require a "more particularized

---

[18] By the time MaineToday filed its petition with the Superior Court, Pak had already been indicted on the five counts.

[19] Even the Superior Court was unable to determine any specific evils that disclosure of the transcripts would cause, referring to the possibility of any resulting harm as "abstract," "hypothetical[]," and "impossible to conceive." Such unidentified and speculative harms are not the types of harm that FOAA seeks to prevent. FOAA's exceptions are to be narrowly construed to serve its larger purpose of transparency in government. 1 M.R.S. § 401; *Citizens Commc'ns Co. v. Att'y Gen.*, 2007 ME 114, ¶ 9, 931 A.2d 503.

approach" based on the circumstances surrounding each record at issue, which is an approach that more closely aligns with the purposes and language of the statute. *Id*. at 180. If the Maine Legislature had intended to exempt from disclosure all E-9-1-1 transcripts, or even all E-9-1-1 transcripts that relate to active homicide cases, it could have, as it did with juvenile fire setter records and ambulance medical reports, for example. *See* 1 M.R.S. § 402(3)(H)-(I); *Landano*, 508 U.S. at 178 (noting that there is "no persuasive evidence that Congress intended for [a law enforcement agency] to be able to satisfy its burden in every instance simply by asserting that [the record was obtained] during the course of a criminal investigation").

[¶31] Here, the Attorney General did not present any particularized possibility of harm. For example, there is no suggestion that other witnesses at the scene would amend their testimony to be consistent with that of the 9-1-1 callers. Given the broad purpose of FOAA and the narrow reach of its exceptions, and mindful of the presumptive right of public access to criminal court proceedings, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980), we conclude that the State failed to meet its burden of establishing the reasonable possibility that disclosure of the Pak E-9-1-1 transcripts would interfere with law enforcement proceedings pursuant to section 614(1)(A). Thus, the Pak E-9-1-1

transcripts, as redacted pursuant to 25 M.R.S. § 2929(2)-(3), are public records subject to disclosure pursuant to the Freedom of Access Act.

The entry is:

> Judgment vacated and remanded to the Superior Court with instructions to enter a judgment requiring the State to disclose the E-9-1-1 call transcripts associated with the Pak matter, as redacted pursuant to 25 M.R.S. § 2929(2)-(3) (2012).

---

**On the briefs:**

Sigmund D. Schutz, Esq., and Jonathan G. Mermin, Esq., Preti Flaherty Beliveau & Pachios, LLP, Portland, for appellant MaineToday Media, Inc.

Janet T. Mills, Attorney General, and William R. Stokes, Dep. Atty. Gen., Office of Attorney General, Augusta, for appellee State of Maine

Patrick Strawbridge, Esq., Bingham McCutchen LLP, Boston, Massachusetts, for amici curiae The Reporters Committee for Freedom of the Press, New England First Amendment Center, Maine Association of Broadcasters, Maine Freedom of Information Coalition, Maine Press Association, and Associated Press

**At oral argument:**

Sigmund D. Schutz, Esq. for appellant MaineToday Media, Inc.

William R. Stokes, Dep. Atty. Gen., for appellee State of Maine

Cumberland County Superior Court docket number AP-2013-6
FOR CLERK REFERENCE ONLY